IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Donald Haywood ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | No. 16 C 2472 |
| ) | |
| Wexford Health Sources, Inc., ) | |
| et al. ) | |
| ) | |
| Defendants. ) | |
| ) | |

MEMORANDUM OPINION AND ORDER

Donald Haywood, an inmate at Pontiac Correctional Center since July of 2016, and previously incarcerated at Stateville Correctional Center, has sued the doctors who treated him at these two institutions and their employer, Wexford Health Sources, Inc.[1] He claims that the doctors provided constitutionally inadequate medical care and that they did so pursuant to Wexford's unconstitutional policy, custom, or practice. He alleges that beginning in late 2013, he repeatedly complained of a constellation of symptoms including chest pain, back pain, side pain, wrist pain, joint pain and swelling, shoulder pain, dizziness, numbness in his leg and back, dental cavities, and stomach problems. Plaintiff also suffered from mental illnesses requiring

---

[1] The Stateville physicians are Drs. Saleh Obaisi (now deceased and substituted in this action by the executor of his estate) and Alma Martija, and the Pontiac physician is Dr. Andrew Tilden.

treatment that is the subject of a separate case also pending before me. *See* Case No. 16-cv-3566 (N.D. Ill.). While certain of plaintiff's physical ailments were related to falls or accidents, others eluded a firm diagnosis. Eventually, a rheumatologist diagnosed plaintiff with an autoimmune disease called Sjogren's Syndrome, and plaintiff later began taking medications for that condition.[2]

Plaintiff alleges that the reason it took years for his Sjogren's diagnosis to emerge is that the frequency of his requests for medical attention—the record reflects that in addition to regular visits to the prison's asthma clinic and mental health providers, plaintiff visited the health care unit just about every month, often several times a month, and sometimes several times a week during the relevant period—led defendants to peg him as a malingerer whose symptoms were more imagined than real. As a result, plaintiff posits, they did not take his complaints seriously and performed only superficial examinations until late 2015, when Dr. Obaisi ordered blood tests that revealed abnormalities prompting a referral to a rheumatologist, who eventually diagnosed plaintiff with Sjogren's Syndrome. But plaintiff's problems did not end there, he claims, because he even after receiving his

---

[2] Sjogren's Syndrome is an autoimmune exocrine dysfunction in which glands that make secretions—typically the salivary and tear glands—become infected or inflamed. Alghafeer Dep., Exh. 9 to Def.'s L.R. 56.1(a) Stmt., at 52. It can become systemic and affect other organs such as the kidneys, lungs, nervous system, and skin. *Id.* In most cases, the disease remains limited to the salivary and tear glands, but in some cases, patients can later develop lung or kidney disease. *Id.* at 52-53.

diagnosis, defendants allegedly failed to follow the rheumatologist's recommendations for managing his condition. In plaintiffs' view, the defendant physicians' conduct reflects their deliberate indifference to his serious medical condition.

Before me is defendants' motion for summary judgment. Defendants argue that plaintiff is not entitled to a trial because the objective, undisputed evidence establishes that the treatment he received was consistent with the standard of care, and that any delays plaintiff experienced in receiving treatment for his Sjogren's Syndrome (or any other condition) did not result in a compensable injury. For the reasons that follow, the motion is granted.

I.

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I must view the evidence and draw all reasonable inferences in favor of plaintiff, as the non-moving party. *Greeno v. Daley,* 414 F.3d 645, 652 (7th Cir. 2005). To survive summary judgment, plaintiff must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

The Eighth Amendment protects prisoners from prison conditions that cause "the wanton and unnecessary infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Evidence that prison medical staff

provided grossly inadequate medical care can support an Eighth Amendment violation if the plaintiff shows: 1) that he suffers from an objectively serious medical condition, and 2) that prison officials knew about the condition and the risk it posed but recklessly disregarded the risk. *Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014) (citation omitted).

The plaintiff's burden of proof is heavy, as an Eighth Amendment violation requires more than negligence or even medical malpractice. *Id*. at 409. Indeed, because the second prong of the analysis requires a plaintiff to show that the defendant had a "sufficiently culpable state of mind," the plaintiff must produce evidence that the treatment he received was "so blatantly inappropriate as to evidence intentional mistreatment." *Greeno*, 414 F.3d at 653 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (Eighth Amendment violation requires proof of an intentional or criminally reckless tort)). In addition, a plaintiff whose deliberate indifference claim is based upon an alleged delay in providing medical treatment must not only prove the objective and subjective components of his claim, he must also offer "verifying medical evidence" that the delay, rather than the underlying condition, caused him harm. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (citations omitted).

A doctor's decision to forego diagnostic tests is "a classic example of a matter of medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Accordingly, a plaintiff whose claim rests on allegations that prison doctors failed to conduct appropriate testing

4

to discover his serious medical condition must come forward with proof that the doctor's decision "departed significantly from accepted professional norms." *Pyles*, 771 F.3d at 411. Similarly, a plaintiff who challenges a doctor's decision not to refer him to a specialist must establish either that the doctor actually knew of his need for specialized treatment, or that the need would have been obvious even to a layperson, such that that the decision not to engage a specialist "permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *Id*. at 412 (citing *Greeno*, 414 F.3d at 654).

II.

Given the breadth of plaintiff's ailments in this case, it is helpful at the outset to focus the analysis on the medical condition that defendants' failure timely to detect and treat allegedly caused him a constitutional injury: Sjogren's Syndrome. Indeed, although plaintiff asserts that he has been diagnosed with numerous conditions, the "gist" of his complaint "is that between 2012-2015, Mr. Haywood appeared many times before the Defendant physicians and presented symptoms of Sjogren's Syndrome," but because Drs. Obaisi and Martija viewed him as "a malingerer and a complainer...they made no *bona fide* attempt to diagnose or treat him for this condition until years later," and that after his diagnosis, they, and later Dr. Tilden, interfered with his treatment. Opp. at 1; *see also* Pl.'s L.R. 56.1(b)(3) Stmt. at ¶¶ 20. But the record simply does not support this characterization of

5

the facts. To the contrary, plaintiff's medical record establishes that defendants consistently responded to plaintiff's complaints, and plaintiff identifies no evidence to suggest that the treatment decisions they made reflected anything other than their medical judgment.

By his own account, plaintiff first reported joint pain—a symptom associated with Sjogren's Syndrome—in June of 2014, and he points to a document that reflects a complaint about pain in his shoulder. But plaintiff's medical record also reveals that he received prompt treatment for this complaint: an x-ray of his shoulder was taken on June 27, 2014, and in the meantime, he was prescribed medication and "instructed to hold off heavy weight lifting till asymptomatic." *See* DN 133-1 at 1794; Exh. 1 to Pl.'s L.R. 56.1(b)(3) Stmt. at IDOC 481.[3] Similarly, after plaintiff complained of knee pain in August of 2014, he was prescribed ibuprofen and a cold pack and was advised to elevate his knee and to avoid bearing weight. *See* IDOC 486. Plaintiff offers no evidence to suggest that the treatment he received on these occasions was inappropriate, much less that it was "blatantly" so. Plaintiff also points to the numerous cavities he had filled between 2013 and 2015 and argues that given the joint problems and skin rashes for which he was

---

[3] I pause here to deplore both parties' practice of identifying cited portions of plaintiff's medical records only by Bates number and failing to indicate where on the docket these documents can be found (for example with reference to an exhibit number and the document to which the exhibit is attached). This practice has done little to aid in the ascertainment of genuine factual disputes and much to frustrate prompt and efficient resolution of defendants' motion.

6

also treated during the same period, Drs. Obaisi and Martija should have investigated whether the cavities were a symptom of Sjogren's Syndrome. Yet, plaintiff points to no evidence of any professional norms mandating diagnostic testing under these circumstances prior to December 2015 to determine whether these symptoms were linked by an underlying disorder.

Indeed, plaintiff offers no evidence at all to controvert the testimony of defendants' expert witness, who opined that the treatment plaintiff received for each of his complaints was well within the bounds of accepted professional standards. Plaintiff's core theory—that the defendant physicians' view of him as a "malingerer" and a "complainer" replaced their exercise of professional judgment—rests entirely on his subjective sense that his complaints were brushed off and the meaning he attributes to a handful of notations in his medical records. For example, plaintiff claims that the emphasis in a notation from a visit on August 8, 2015, which states that plaintiff was "brought up for chest pains, <u>third time this week</u>," IDOC 541 (original emphasis), reflects Dr. Martija's "frustration" with his frequent visits to the prison health care unit. Similarly, plaintiff reads skepticism into the observation recorded on September 23, 2015, that plaintiff "has been evaluated multiple times by different providers" for complaints of a racing heart and chest pain. IDOC 559. But plaintiff does not dispute that these notations are factually accurate, and even assuming the inferences he draws from their emphasis is correct, the objective

7

medical record establishes that prison medical staff nevertheless investigated and treated his complaints: In response to his complaint of August 8, plaintiff received a physical examination, a blood pressure check, a respiration and heart rate check, and an EKG, all of which produced normal results, *see* IDOC 541, and on September 23, plaintiff had his temperature, pulse, blood pressure, and respiration checked and was scheduled for a follow up appointment with the prison medical director on October 13, 2015. Plaintiff's subjective belief that these treatments were "superficial" and designed to "get[] him to go away and stop bothering" the prison medical staff is not substantiated by any competent medical evidence. Pl.'s L.R. 56.1(b)(3) Stmt. ¶ 43. At all events, courts "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016) (en banc). Plaintiff's medical records comprise over a thousand pages, and the isolated remarks he points to on a handful of entries fall far short of establishing defendants' unconstitutional disregard for his Sjogren's Syndrome.[4]

---

[4] Plaintiff argues that defendants' treatment of his ailments "unrelated to Sjogren's Syndrome [is] immaterial to this lawsuit." Opp. at 10 (objecting to evidence that Drs. Obaisi and Martija provided appropriate care for dizziness, chest and stomach pain, and asthma). But because "deliberate indifference" requires an analysis of the totality of the care defendants provided, the physician defendants' treatment of plaintiff's other conditions is relevant to the subjective component of the Eighth Amendment analysis. What is true, however, is that plaintiff relies exclusively on his Sjogren's diagnosis to satisfy the objective component of the analysis—the existence of a serious medical condition.

Plaintiff insists that the record contains "copious evidence" of a "lengthy pattern of unconstitutional behavior" by the physician defendants. Opp. at 6. But the "evidence" he cites boils down to his subjective view that it took too long for Drs. Obaisi and Martija to recognize the need for specialized treatment and speculation about the reasons for the perceived delay. For example, plaintiff cites as evidence of these doctors' foot dragging the failure to provide specialists with "relevant portions" of plaintiff's medical file in advance of his consultations. Yet, so far as the record reveals, that was entirely consistent with standard practices; and even if it was not, plaintiff offers no evidence that the doctors intentionally withheld his medical files or that they recklessly failed to ensure that the files were timely transmitted to the specialists.

In any event, it appears that plaintiff would not have been treated any sooner for Sjogren's Syndrome if his medical records had been sent to his rheumatologist earlier. Dr. Alghafeer, plaintiff's first rheumatologist, testified that even after confirming plaintiff's diagnosis, he "wasn't that concerned...that I needed to initiate any treatment," and decided instead upon a course of "managed observation." Alghafeer Dep., DN 133-8 at 60. Moreover, even if plaintiff could show that defendants' conduct prevented him from receiving timely treatment for Sjogren's Syndrome, a delay in treatment gives rise to an Eighth

---

In other words, plaintiff does not claim to have been injured by the medical care he received for any of his other medical conditions.

Amendment violation only where the plaintiff provides "independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730-31 (7th Cir. 2016) (en banc). Plaintiff offers no evidence of this sort.[5]

This leaves only the question of whether plaintiff is entitled to a trial on his theory that the treatment he received *after* his Sjogren's diagnosis violated the Eighth Amendment. Plaintiff argues that each of the physician defendants manifested deliberate indifference to his serious medical condition by failing to follow the treatment regimen that his rheumatologists recommended for Sjogren's Syndrome. It is true that the specialists' recommendations were not followed to the letter, notably with respect to the length of time between visits to monitor plaintiff's condition. Still, that shortcoming does not entitle

---

[5] Defendants assert that there is no evidence of any disease progression, vital organ involvement, or system complications attributable to their treatment of plaintiff's Sjogren's Syndrome. *See* Def.'s L.R. 56.1(a) Stmt., ¶¶ 118, 139. Plaintiff purports to dispute these statements with citations to "Arami Exh. A" to show his putative diagnosis of Sjogren's-related fibromyalgia. *See* Pl.'s L.R. 56.1(b)(3) Stmt., ¶¶ 118, 139. But the only exhibits attached to plaintiff's responsive factual statements are numbered 1-3, and if there is an "Exh. A" to any document plaintiff submitted, I have been unable to find it. Plaintiff also cites the deposition of Dr. Arami—evidently one of his treating physicians—to support his position on the issue of disease progression, but he again fails to identify any record entry corresponding to his citation. Meanwhile, defendants identify Dr. Arami's deposition transcript as Exhibit 10 to their factual statement; but Exhibit 10 (like Exhibits 9 and 11) is the transcript of *Dr. Alghafeer's* deposition. As best I can determine based on my unguided review of the three thousand page, predominantly sealed record in this case, Dr. Arami's deposition transcript is not before me, leaving no "verifying medical evidence" to support plaintiff's delay-based Eighth Amendment claim.

plaintiff to a trial absent some evidence that these delays, or the occasional unavailability of plaintiff's prescribed medication, were the result of the doctors' culpable state of mind. *See Gaston v. Ghosh*, 920 F.3d 493, 496 (7th Cir. 2019) (affirming summary judgment where plaintiff offered no evidence to show "*who* was responsible for the delays (the four physicians named as defendants? back-office staff? someone else?) or *why* those delays occurred (a desire that [the plaintiff]'s pain continue? indifference to his pain? simple negligence? medical judgment?)") (original emphasis). The suggestive language plaintiff uses to color his responses to defendants' factual statements, *see*, e.g., Pl.'s L.R. 56.1(b)(3) Stmt., ¶ 93 (admitting that Dr. Tilden "begrudgingly complied" with Dr. Alghafeer's recommendations), does not substitute for competent medical evidence suggesting that defendants' treatment decisions fell so far outside the field of reasonable professional competence as to allow a jury to infer deliberate indifference to plaintiff's serious medical condition.

There is no doubt that plaintiff has received a great deal of medical treatment while incarcerated. Indeed, he does not dispute that he consulted multiple specialists—a rheumatologist, a cardiologist, a gastroenterologist, an optometrist, and an orthopedic spine specialist— upwards of twenty times between June of 2016 and June of 2018. Plaintiff believes that his Sjogren's Syndrome should have been diagnosed sooner, and that he should have received more frequent monitoring and more consistent pharmaceutical treatment for that condition. Nevertheless,

11

the totality of the record is not such as would allow a reasonable jury to conclude: a) that the defendant doctors intentionally or recklessly disregarded plaintiff's symptoms of Sjogren's Syndrome; b) that the defendant doctors failed to authorize or provide treatment for that condition after it was diagnosed; or c) that plaintiff suffered a constitutional injury as a result of any delay in treatment. Accordingly, the physician defendants—and thus all defendants—are entitled to summary judgment. *See Gaston*, 920 F.3d at 497 (to hold Wexford liable for its employees' conduct under any theory, plaintiff must show that "*someone* whose acts are imputed to *Wexford* violated the Eighth Amendment").

III.

For the foregoing reasons, defendants' motion is granted.

**ENTER ORDER:**

*[signature]*

**Elaine E. Bucklo**

United States District Judge

Dated: June 5, 2019